Mr. Justice DAVIS
delivered the opinion of the court.
The right to recover is placed mainly on two grounds.
First. That Sage, in the absence of any agreement, could not by private treaty become interested in the mortgaged property, to the exclusion of the other partners.
Second. That there was an agreement that Sage should act *528 as the agent of his copartners in perfecting the title to the mortgaged premises; and having violated his agreement and made a private bargain with Mitchell for his individual benefit, he is chargeable as trustee.
Each partner is the agent of his copartners in all transactions relating to partnership business, and is forbidden to traffic therein for his own advantage, and if he does, will be held accountable for all profits. But beyond the line of the trade or business in which the firm is engaged, there is no restraint on his right to traffic. As one partner has no authority to bind the firm outside of their ordinary business, he cannot of course be held liable to account, should he make a profitable adventure in a matter not legitimately connected with the business of the firm. The difficulty generally is, to ascertain what acts are within the scope of the particular trade or business. But in this case there is no embarrassment whatever in the application of the principle. This was a partnership to do a general produce business. It contemplated no dealings in real estate, and each partner was at liberty to buy and sell real estate, and was under no legal liability to account to his copartners. The debt due from Sweet belonged to the partnership, and not the premises mortgaged. To the extent of their debt the partners had an interest in the mortgaged property, and no further. They were interested to have the debt paid, not to pi’oeure title to the mortgaged property. It can readily be seen thal it would be profitable to get a real estate worth $50,000 for $34,000; but how an engagement to do a general produce business could embrace that speculation is not so apparent. Sage’s legal relations to his copartners extended to the procurement of the money due from Sweet. They were neithei more nor less. But it is said that the copartners were desirous, if possible, of obtaining the title to the mortgaged premises, and that Sage undertook the negotiation for them, and made an effective arrangement with Mitchell, which he afterwards relinquished, and secured clandestinely an advantage to himself, to the injury of the other partners, and should, therefore, be held to account for profits.
*529 The evidence in this case, consisting mainly of letters interchanged between Wheeler and Sage, shows clearly enough that a scheme was initiated to get the title to the property, and that Sage was the active agent to perfect it, but for some unexplained reason it failed. The evidence does not prove that Sage made a contract with his copartners to perfect the title, but his engagement was to consummate a contract with Mitchell, if it could be done, by which the object could be accomplished. All parties rested in the belief that the negotiations with Mitchell would be successful ; but from some motive not disclosed in the record, Sage abandoned the idea of buying the property on joint account, and bargained with Mitchell in his own behalf.
Generally, when a party obtains an advantage by fraud, he is to be regarded as the trustee of the party defrauded, and compelled to account. But if a party seeks relief in equity, he must be able to show that on his part there has been honesty and fair dealing. If he has been engaged in an illegal business and been cheated, equity will not help him. “ The Warehouse Case,” as it is somewhere called in the record, is anything but creditable to the parties concerned, and it is surprising that they should have been willing to give publicity to it through a legal proceeding. Sweet was an insolvent debtor, owing Sage, Wheeler & Slocum $24,000, secured on real estate in Milwaukee, which was worth, when the security was given, $50,000, and over $100,000 when the bill in this ease was filed. In 1854 and 1855, when the scheme to perfect the title was in full pi'ogress, the property was appreciating in value. Judgments had been entered against Sweet in favor of Mitchell to the amount of $18,556.04, and in favor of various other creditors for the sum of $59,597.73. Suit to foreclose was commenced, and a vigorous defence interposed. Sweet denied that there was as much due on the mortgage as was set forth in the bill, and he claimed a share of the general business, and that he was entitled to a credit of $12,000 for the rent of the warehouse for three years, during which time it had been occupied by Wheeler & Co. If this defence was successful, they *530 could not hope to “ perfect the title.” The property was too valuable and the venture too great to lie idle and wait the ordinary progress of a suit m chancery. The property must be saved at all events and Sweet’s peace bought. Wheeler writes to Sage, May 5, 1855: “ F. thinks if you can buy Sweet’s peace, that the creditors of Sweet could be bluffed off, by getting a large decree and taking a proper time to sue it, and the price of Sweet’s peace to be contingent to the final adjustment of title.” Again, under date of May 18, he writes to Sage, “ that if. we do not make some arrangement with S. to stop the defence and let us have the decree at this term, we will have to take the money on the mortgage, as the property has risen in value more than 100 per cent, within the last two years, and we want you and Mr. Slocum to come out at once and do something.”
“ To perfect the title” and grasp the coveted prize, the defence must be stopped, Sweet bought off, and the decree enlarged beyond the just sum, so as to “ bluff creditors.” The nearer the decree was to the actual value of the property, the less was the chance of being outbid. To pay value for the property was not embraced in the scheme, but if Sweet was silenced, there would be no difficulty of fixing the decree at a sum which would tend to repress competition, and the decree was actually made for the sum of $33,000, when the amount due was only $24,000. It is true that Sage, in his answer, says that Mitchell had this done from motives of his own. But the correspondence between Wheeler and Sage abundantly proves, that to get a decree for the nominal instead of the real amount due on the mortgage, was one of the main parts of their project.
The court was imposed on, and a combination formed, the object and direct tendency of which was to secure tbe title to the valuable real estate of an insolvent debtor, at the expense and sacrifice.of his creditors.
A proceeding like this is against good conscience and good morals, and cannot receive the sanction of a court of equity. The principle is too plain to need a citation of authorities to confirm it. It is against the policy of the law to help either *531 party in suck, controversies. The maxim, “ in pari delicto votior est conditio defendentis,” must prevail.
Decree affirmed with costs.